## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Case No.

PATRICIA SALYERS, derivatively on behalf of Nominal Defendant BAXTER INTERNATIONAL, INC.,

Plaintiff,

v.

WALTER E. BOOMER, BLAKE E. DEVITT, JOHN D. FORSYTH, GAIL D. FOSLER, JAMES R. GAVIN III, PETER S. HELLMAN, WAYNE T. HOCKMEYER, JOSEPH B. MARTIN, ROBERT L. PARKINSON, CAROLE J. SHAPAZIAN, THOMAS T. STALLKAMP, K.J. STORM, ALBERT P.L. STROUCKEN, ROBERT M. DAVIS, NORBERT G. RIEDEL, and DOES 1-20,

Defendants,

v.

BAXTER INTERNATIONAL, INC.,

Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## I. OVERVIEW OF THE ACTION

1. Plaintiff Patricia Salyers, a shareholder of Baxter International, Inc. ("Baxter" or the "Company"), on behalf of the Company, and through her counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint") against certain officers and directors of Baxter concerning wrongdoing that occurred between at least September 2009 to the present. On behalf of Baxter, Plaintiff asserts against the Individual Defendants – Baxter's directors and officers – federal securities law violations, state law claims for breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, insider trading, and waste of corporate assets, seeking to recover substantial losses to Baxter and other damages, such as to its reputation and goodwill.

2. Baxter, through its subsidiaries, develops, manufactures and markets products that save and sustain the lives of people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions.

3. Beginning in September 2009, the Individual Defendants caused the Company to issue materially false and misleading statements about the Company's plasma-derivative products business. The Individual Defendants represented that the Company's recent improvements in gross margin were sustainable and would expand, even though the Individual Defendants knew that recent developments in the plasma industry would inhibit Baxter's growth.

4. The Individual Defendants also caused the Company to issue materially false and misleading statements about the remediation of the Company's COLLEAGUE infusion pump. In particular, the Individual Defendants failed to disclose that Baxter was not complying with the terms of a June 2006 consent decree it had entered into with the U.S. Food and Drug Administration ("FDA").

5. Because the Individual Defendants issued false and misleading statements about the Company's growth prospects for its plasma-derivative products business and failed to disclose that it was not in compliance with FDA requirements, Baxter stock traded at artificially inflated prices, reaching a high of $61.71 per share on January 14, 2010.

6.     On April 22, 2010, Baxter reported its first quarter 2010 financial results, reducing its revenue and earnings outlook for 2010. The Individual Defendants revealed that due to continuing pressures in the Company's critical plasma-derivative products business, including a loss in market share as well as the impact of healthcare reform legislation, the Company's revenue guidance for 2010 was being reduced from revenue growth in the range of 5% to 7%, to the range of 1% to 3%. When the Individual Defendants revealed the Company's true operating condition, Baxter's stock collapsed $7.82 per share to close at $51.13 per share on April 22, 2010 – a one day decline of over 13%.

7.     On May 3, 2010, the Individual Defendants announced that the FDA ordered the Company to recall its COLLEAGUE pumps under the June 2006 consent decree. The FDA also issued a press release about Baxter's recall, specifying that the action was necessary because of the Company's "longstanding failure to correct many serious problems with the pumps." When the Individual Defendants disclosed the FDA's recall, Baxter's stock dropped $2.42 per share to close at $45.08 per share on May 4, 2010 – a one day decline of over 5%.

8.     Baxter's Board of Directors (the "Board") had previously authorized the Company to repurchase up to $2 billion of its common stock on the open market. While the Individual Defendants were issuing false and misleading statements, the Individual Defendants caused the Company to repurchase over *$1.4 billion* of its own shares at artificially inflated prices.

9.     Over a nine-month period, the Individual Defendants knew the true operating condition of the Company but concealed the following facts from shareholders and the investing public:

(a)     Supplies of plasma were increasing and prices were decreasing because of the failed merger of Baxter's two largest competitors;

(b)     Baxter's boost in market share and gross profit margin while a competitor's merger was pending was only temporary and the Company was incapable of sustaining the benefits once the merger failed;

(c)     Baxter's revenue guidance for 2010 related to its plasma-derivative products business was overstated;

(d)     Baxter represented that its long-range plan for its BioScience division was revenue growth in the 7% to 9% range; the Company, however, was experiencing a loss in market share and pricing pressures related to its plasma-derivative products business;

(e)     Baxter was not complying with the June 2006 consent decree it had entered into with the FDA regarding its COLLEAGUE pumps; and

(f)     Baxter would not be able to complete remediation of the COLLEAGUE pumps in 2010.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Many of the acts complained of herein occurred in this District and Baxter's principal executive offices are located at One Baxter Parkway, Deerfield, Illinois 60015, where the day-to-day operations of the Company are directed and managed.

## III.     THE PARTIES

### A.     Plaintiff

12.     Plaintiff Patricia Salyers is a current shareholder of Baxter and was a shareholder of Baxter at the time of the transactions and events complained of herein.

### B.     Nominal Defendant Baxter

13.     Nominal Defendant Baxter is a Delaware corporation with its principal executive

offices located at One Baxter Parkway, Deerfield, Illinois 60015. As of March 8, 2010, Baxter had more than 599 million outstanding shares. Baxter is traded on the NYSE under the ticker symbol "BAX."

### C.    Individual Defendants

14.    Defendant Robert L. Parkinson ("Parkinson") has served as Chairman of the Board, and as Chief Executive Officer since April 2004. While the Individual Defendants were issuing false and misleading statements about the Company, Defendant Parkinson sold 88,400 shares of his Baxter stock at artificially inflated prices for proceeds of over $5 million. Baxter paid Parkinson the following compensation:

| Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Incentive Compensation ($) | Change in Pension Value ($) | Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2009 | 1,342,000 | 4,785,304 | 2,982,046 | 2,500,000 | 2,518,252 | 233,143 | 14,361,305 |

15.    Defendant Robert M. Davis ("Davis") has served as Chief Financial Officer and Corporate Vice President from 2006 to 2010. He was previously the Treasurer from 2004 through 2006. While the Individual Defendants were issuing false and misleading statements about the Company, Defendant Davis sold 17,260 shares of his Baxter stock at artificially inflated prices for proceeds of over $1 million. Baxter paid Davis the following compensation:

| Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Incentive Compensation ($) | Change in Pension Value ($) | Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2009 | 576,923 | 1,066,887 | 668,147 | 814,320 | 115,023 | 101,027 | 3,342,327 |

16.    Defendant Norbert G. Riedel ("Riedel") has been the Chief Scientific Officer and a Corporate Officer since March 2001. While the Individual Defendants were issuing false and

misleading statements about the Company, Defendant Riedel sold 175,186 shares of his Baxter stock at artificially inflated prices for proceeds of over $10 million.

17.     Defendant Walter E. Boomer ("Boomer") has served as a Director of Baxter since 1997 and was appointed Lead Director in May 2008. Boomer is a member of the Compensation Committee and Public Policy Committee.

18.     Defendant Blake E. Devitt ("Devitt") has served as a Director of Baxter since 2005. Devitt is Chairman of the Audit Committee and a member of the Corporate Governance Committee.

19.     Defendant John D. Forsyth ("Forsyth") has served as a Director of Baxter since 2003. Forsyth is Chairman of the Compensation Committee and Chairman of the Corporate Governance Committee.

20.     Defendant Gail D. Fosler ("Fosler") has served as a Director of Baxter since 2001 and has served as President. Fosler is a member of the Audit Committee and the Finance Committee.

21.     Defendant James R. Gavin III ("Gavin") has served as a Director of Baxter since 2003. Gavin is Chairman of the Corporate Governance Committee and a member of the Public Policy Committee.

22.     Defendant Peter S. Hellman ("Hellman") has served as a Director of Baxter since 2005. Hellman is a member of the Compensation Committee and a member of the Finance Committee.

23.     Defendant Wayne T. Hockmeyer ("Hockmeyer") has served as a Director of Baxter since September 2007. Hockmeyer is Chairman of the Public Policy Committee and a member of the Finance Committee.

24.     Defendant Joseph B. Martin ("Martin") has served as a Director of Baxter since 2002. Martin is a member of the Corporate Governance Committee and the Public Policy Committee.

25.     Defendant Carole J. Shapazian ("Shapazian") has served as a Director of Baxter

since 2003. Shapazian is a member of the Compensation Committee and the Public Policy Committee.

26.     Defendant Thomas T. Stallkamp ("Stallkamp") has served as a Director of Baxter since 2000. Stallkamp is a member of the Audit Committee and the Compensation Committee.

27.     Defendant K.J. Storm ("Storm") has served as a Director of Baxter since 2003. Storm is Chairman of the Finance Committee and a member of the Audit Committee.

28.     Defendant Albert P.L. Stroucken ("Stroucken") has served as a Director of Baxter since 2004. Stroucken is a member of the Audit Committee and the Finance Committee.

29.     Parkinson, Boomer, Devitt, Forsyth, Fosler, Gavin, Hellman, Hockmeyer, Martin, Shapazian, Stallkamp, Storm, and Stroucken are sometimes referred to herein as the "Director Defendants."

30.     Parkinson, Davis, and Riedel are sometimes referred to herein as the "Officer Defendants."

31.     Devitt, Fosler, Stallkamp, Storm, and Stroucken are sometimes referred to herein as the "Audit Committee Defendants."

32.     The Director Defendants, the Officer Defendants, and the Audit Committee Defendants are sometimes referred to as the "Individual Defendants."

33.     The true names and capacities of Defendants sued herein as Does 1 through 20, inclusive, are presently not known to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek to amend this Complaint pursuant to Federal Rule of Civil Procedure 15 and include these Doe Defendants' true names and capacities when they are ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by Baxter as a result of Defendants' wanton and illegal conduct.

## IV.    BACKGROUND

34.     Baxter, through its subsidiaries, develops, manufactures and markets products for people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other

chronic and acute medical conditions. The Company's products are used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices, clinical and medical research laboratories, and by patients at home under physician supervision.

### A. Baxter's Plasma-Derivative Products

35.     Baxter has three operation segments: BioScience, Medication Delivery, and Renal. Its BioScience segment is its largest segment with $5.6 billion in sales in 2009. BioScience products represent approximately 45% of Baxter's annual sales. Baxter's BioScience business is a leader in the following: (1) recombinant and plasma-based protein replacement therapies to treat hemophilia and other bleeding disorders; (2) plasma-based therapies to treat immune deficiencies, alpha 1-antitrypsin deficiency, burns and shock, and other chronic and acute blood-related conditions; (3) products for regenerative medicine, such as biosurgery products and technology used in adult stem-cell therapies; and (4) vaccines.

36.     A major part of Baxter's BioScience business involves refining donated plasma to make products that treat problems such as immune-system disorders and hemophilia. Baxter is the largest supplier of plasma-derivative protein therapies in the world. The Company's plasma-derivative products and its intravenous immune globulin ("IVIG") antibody therapy products are 22% of Baxter's total sales. In recent years, price increases related to IVIG products have driven much of the growth in the Company's earnings.

37.     In 1990, there were thirteen producers of plasma-derivative products. Over time the market consolidated and there were only five producers of plasma-derivative products in 2008. Three of the five producers – Baxter, CSL Limited ("CSL"), and Talecris Biotherapeutics ("Talecris") – controlled over 80% of the market.

38.     In the late 1990s and early 2000s, there was an adequate supply of plasma which led to much lower prices. Suppliers of plasma-derivative products suffered as much as a 30% decline in gross operating margin due to the glut of plasma in the market. As the industry merged, the supply of plasma was restricted as acquiring companies would shut down collection centers after an acquisition. As CSL noted soon after its acquisition of Aventis Behring in 2004,

a merged company would typically cut production capacity by 25%. The reduction in supply led to improved prices and profits throughout the industry. Maintaining a supply and demand equilibrium was critical to the success of the suppliers of plasma-derivative products.

39. In 2008, Talecris, the third-largest supplier of plasma-derivative products, experienced certain manufacturing disruptions, including a shortfall in supply. Baxter benefited from the supply constraint by gaining market share and by enjoying increases in the price of plasma products. Nonetheless, Talecris announced plans to aggressively expand its production capacity in late 2008 and 2009. Prior to Talecris implementing its planned expansion, CSL, the second-largest supplier of plasma-derivative products, entered into a merger agreement to acquire Talecris in August 2008.

40. But on May 27, 2009, the Federal Trade Commission ("FTC") filed a lawsuit to block CSL's proposed acquisition of Talecris on the basis that the merger would be anticompetitive and would violate federal antitrust laws. According to the FTC complaint, the industry already operated "as a tight oligopoly, with a high level of information sharing and interdependence among firms." Producers in the industry had for years realized that they could maximize profits by restricting the supply of plasma-derivative products and raising prices. The FTC believed that the acquisition of Talecris would effectively eliminate the only significant threat to the "durable and highly profitable oligopoly."

41. As a result of the FTC's lawsuit, CSL abandoned its plans to acquire Talecris on June 9, 2009. After the abandonment of the merger, Talecris subsequently returned to full production in its supply of plasma products to the market. Thus, the Individual Defendants knew that by the summer of 2009 the temporary boost in sales that the Company had enjoyed while the merger was pending had ended.

42. Additionally, on July 15, 2009, Pemiscot Memorial Hospital initiated a class action suit against Baxter and CSL alleging that the two rivals had created an illegal plasma cartel to engage in a conspiracy to fix the price of life-saving blood plasma products by restricting the supply of plasma, inflating the price of the products and eliminating competition.

-8-

By February 2010, eighteen other plaintiffs had joined the class action lawsuit against Baxter and CSL, including the Mayo Clinic, one of the United States' most prestigious and well-funded hospitals.

43.    These factors adversely affected Baxter's ability to maintain high prices and market share.

**B.    Baxter's COLLEAGUE Pump Products**

44.    Baxter's second largest segment is its Medication Delivery business, which had sales of $4.65 billion in 2009. Baxter is a leading manufacturer of products used in the delivery of fluids and drugs to patients.

45.    Baxter's Medication Delivery segment manufactures and sells electronic infusion pumps that deliver intravenous fluids such as medication or nutrients to patients in a controlled manner. Baxter began selling its COLLEAGUE pump in the mid-1990s. However, given numerous design deficiencies, the COLLEAGUE pump came under scrutiny with the FDA beginning in 1999. Nonetheless, Baxter continuously failed to correct the design deficiencies and in 2005 authorities seized more than 6,000 COLLEAGUE pumps that were thought to have serious defects that caused them to shut down or deliver the wrong amount of medication. As a result, the FDA forced Baxter to stop selling COLLEAGUE pumps in the U.S. market due to various design flaws, battery failures, and related software issues.

46.    At the time Baxter stopped selling its COLLEAGUE pumps, around 200,000 of the pumps remained on the market and were still in use at hospitals and other healthcare facilities throughout the country. In June 2006, Baxter entered into a consent decree with the FDA. Pursuant to the consent decree, Baxter agreed to not manufacture or distribute any new COLLEAGUE pumps, and the Company further agreed to work with the FDA on a remediation plan to correct the deficiencies of the COLLEAGUE pumps still in operation.

**V.    SUBSTANTIVE ALLEGATIONS**

47.    Beginning in September 2009, the Individual Defendants caused the Company to issue false and misleading statements or to fail to disclose that: (1) the Company overstated its

growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company was not complying with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and the Company would be unable to complete the remediation of the COLLEAGUE pumps in 2010.

48.     On September 16, 2009, the Individual Defendants caused the Company to host an Investor Conference for analysts, media representatives and investors, issuing a press release highlighting discussion points for its 2009 Investor Conference, which stated in part:

> *Over its five-year long-range plan period, Baxter expects to increase sales approximately 7 to 8 percent (excluding the impact of foreign currency), grow earnings per share in the 11 to 13 percent range*, and generate strong annual cash flow of approximately $4 billion by the year 2014. The company also plans to continue focusing on innovation and expanding its robust pipeline by increasing investments in R&D at a compounded annual rate of at least 8 to 10 percent.

> "We remain committed to transforming our culture to one with a sustained focus on innovation and demonstrating the value of our products and therapies through clinical differentiation," says Robert L. Parkinson, Jr., chairman and chief executive officer. "We believe we have a balanced outlook and are well-positioned to achieve our results while making appropriate investments to enhance future growth and delivering value to shareholders."

> \*       \*       \*

> *"We remain focused on delivering growth and achieving our long-term objectives,"* says Robert M. Davis, corporate vice president and chief financial officer. "Our financial performance and disciplined approach toward capital allocation allow us to provide an attractive return to our shareholders while expanding our innovative pipeline and global presence."

49.     Defendants Parkinson, Davis, and Riedel participated in the September 2009 Investor Conference. During the conference, Defendants repeatedly assured investors about the Company's ability to meet its long-range plan, including making the following statements:

> •     "As you may recall, when we met here in May of 2005, we framed the growth potential of our existing portfolio of businesses. You may remember that we shared our Base Case Long-Range Plan that projected at that time about 5% annual compounded revenue growth over a five-year Long-Range Plan period. At that time, we also discussed our aspiration to exceed that objective through a

variety of initiatives. Two years later, in March of 2007, we updated that Long-Range Plan sales growth to approximately 7%. . . . *[W]e believe that our current normalized rate of revenue growth has increased to the 7 to 8% range going forward*. This provides the new Base Case platform for which to view our future."

- "Of course, while we focus our efforts on disciplined growth acceleration, *we've remained diligent ensuring that we continuously improve margins and drive annual EPS increases at a faster rate than revenue growth.* Our confidence in that assertion will I believe be reinforced by the various presentations that you'll hear throughout the day."

- "[O]ur management team has a *fabulous track record of meeting or exceeding our key financial objectives. . . .* Incorporated in our plan is our *expectation of continued margin expansion,* which provides us with the flexibility to invest in select programs and also enhance our short-term and our long-term growth."

- "[W]e're proud of our *sustained success in meeting or exceeding our financial commitments* despite a very challenging global economic climate that has developed. We've achieved record sales resulting in an acceleration of normalized sales growth over the last several years. This success validates the strength and value of our diversified business model and illustrates the solid fundamentals underpinning our portfolio."

- "Given the strength of our Base Case Long-Range Plan and the defined opportunities we have to deliver this growth, the key to our success lies in our ability to execute. *We believe our plans are realistic and achievable . . . .* Two years ago, we laid out a Base Case Long-Range Plan. As I mentioned earlier, we've [sic] or exceeded these objectives. More importantly, over the long term we've consistently improved our outlook. *Our 2009 Long-Range Plan Base Case confirms sustainable improvement in key financial metrics and further validates the success of our strategy.*"

- "In summary, as a result of the strong underlying fundamentals and solid growth opportunities across our portfolio, *we're confident that our Base Case assumptions will deliver 7 to 8% sales growth* over the LRP horizon."

- "In BioScience, *we expect revenue growth of 7 to 9%* as we focus on improving access to care and standards of care and drive differentiated value with expanded indications and the development of new therapies."

- "We expect to see continued gross margin expansion across all businesses and regions over the Long-Range Plan. *One of the most frequently asked questions we receive is, given the improvement in gross margin is the margin sustainable and can it expand even further? Well, the answer is yes.* As we've frequently mentioned, there are a number of levers that will drive meaningful gross margin expansion over the Long-Range Plan."

-11-

- "Margin improvement has largely been driven by the strength of our BioScience business, which has been our largest and fastest growing business and is also the highest margin business in the company. *Another question we frequently receive from investors is in regard to price improvement and the impact that they've had on our gross margin improvement*. We believe many investors focus on this given the recovery we've experience[d] in the plasma market over the last several years, without fully appreciating the breadth and depth of other margin drivers such as improved product mix, product upgrades, lower cost and improved yield. While price alone has accounted for approximately 25% of the company's overall percentage margin improvement since 2006, other catalysts drove approximately 75% of that change as we've reached the margin of over 50% in 2008."

50.     During the September 2009 Investor Conference, Defendant Parkinson represented the following concerning the Company's COLLEAGUE pump:

[PETER J. ARDUINI, Corporate Vice President – President, Medication Delivery:]

So COLLEAGUE, COLLEAGUE has been a workhorse pump for nearly 15 years. So it wasn't designed with current generation smart pump features, I mean it has limited communication capabilities unlike our next-generation pumps. However, because of the workflow and ease-of-use, it's still favored by many customers worldwide. And as you know, COLLEAGUE is in the midst of being remediated in the U.S. and we will continue to complete our obligations to customers. That being said, as with all older platforms, COLLEAGUE will be phased down in the future and Spectrum and our next-generation pumps will be the platform that we'll base our growth on in the years to come.

\*     \*     \*

[ANALYST:] Okay. And last just to make sure I understood what you were saying about COLLEAGUE, it sounds like you are hoping to fully resolve or if I remember correctly early 2010 [sic]. Maybe just remind us one, what's left to do to get it fully resolved and added, and two, what should we expect commercially once that's done? I mean and what's assumed in the plan as we see some surge in sales, those people have been waiting or what do we expect? Thank you.

. . . [PARKINSON:] I mean we continue with the remediation efforts. We have remediated well over 100,000 devices in the U.S. *We continue to work with the FDA on how we move forward and complete that remediation.*

*There has been a number of things that as we have conducted the remediation that was a basis of some follow-on field corrective actions that we*

*announced earlier in the year, that we still need to get, we still need to get tied down, which we're hopeful that we can get that resolved certainly in 2010.*

What Pete pointed out in his presentation is COLLEAGUE was first launched in the U.S. market in what about '96, '97, something like that. So this is well over 10, 12-year-old device that [h]as Pete pointed out in his presentation doesn't have if not a smartphone, but doesn't include a lot of the technology that's represented in many of the devices, including the SIGMA device that we did the deal on and what's reflected in our next generation products.

So the position we are in now, as we want to complete the remediation of COLLEAGUE. We want to understand how our promotional efforts focused on COLLEAGUE going forward, SIGMA and our next generation platform recognizing that the response to SIGMA to date has been very good, very good. And we were moving down a path where we were hopeful that we can launch our next generation platform into the U.S. market in the not-too-distant future.

So we are managing all those things. I think that the good news is for the first time in a long time with the SIGMA deal, we are able to proactively promote an infusion pump. Hospitals continue to hang on to the COLLEAGUES remediated or un-remediated because frankly most of our hospital customers continue to be very satisfied with the product. But it is an aging device and at the right time we need to reassess where we allocate our promotional focus in our resources between really now a three, what will be a three-product family.

51. Based on these positive statements, Baxter's stock rose $2.41 per share to close at $58.53 per share on September 17, 2009.

52. Then, on October 15, 2009, the Individual Defendants caused Baxter to issue a press release reporting the Company's financial results for the third quarter of 2009. The Company reported BioScience revenue of $1.4 billion for the quarter. Baxter further forecast sales growth for the fourth quarter of 2009 of 6% to 8%, excluding the impact of foreign currency.

53. After releasing its third quarter 2009 earnings results on October 15, 2009, the Individual Defendants caused Baxter to host a conference call for analysts, media representatives, and investors. During the call Defendant Davis stated:

*To summarize, we continue to see strong demand and favorable year-on-year price improvements across the entire plasma protein portfolio.*

In antibody therapy, sales of $336 million grew 9% and excluding foreign currency, sales advanced 12%. This is the continued result of increased demand and higher year-on-year prices. *Additionally, we continue to estimate demand growth in high single digits at the high-end of the mid to high single digit longer term guidance we provided at our investor conference last month*.

54.     On November 11, 2009, the Individual Defendants caused Baxter to participate in the Credit Suisse Healthcare Conference for analysts and the media, during which Defendant Davis represented the following:

If you focus on our first business, which is our largest business, that being bioscience. In 2008 we enjoyed sales of $5.3 billion and this was spread across our recombinant franchises, our plasma proteins, regenerative medicine, and vaccines. *As we've talked about at our recent investor conference we had a couple of years ago, we do expect to see growth in this business on the top line of 7% to 9% overall long range plan*. And I'll talk about here in a moment some of the key areas we see, which will really allow us to drive that kind of growth in this business.

55.     On January 12, 2010, the Individual Defendants caused Baxter to participate in the JP Morgan Healthcare Conference for analysts, media representatives and investors. During the call, Defendant Davis represented in part:

- "BioScience is our largest business with sales in 2008 of $5.3 billion. *And as you look out over our long-range horizon, we do expect the BioScience business to continue to grow in the 7% to 9% on a compounded average basis*."

- "Another key franchise for the Company is our plasma biotherapeutics business. And as you can see here from the chart, *we continue to believe we are going to see strong growth in demand in this business*. And I would comment up front that as we look at a lot of noise we've heard recently on people focusing on the quarter-to-quarter moves in this business, *I would take you back to the detailed presentation we gave in September and tell you that our outlook for the long-term of this business with growth in demand in the mid-to high-single digits has not changed*."

- "So as we look at this business, *we continue to have confidence in it, we continue to see it as a sustainable growth business for the Company and one which will continue to drive value for the Company*."

- "So as you look at the culmination of all of those businesses and as we look out over our long-range plan, *we do believe we are going to be able to deliver sales growth in the 7% to 8% range with gross margins approaching 55%*, operating margins around 28%, and you can see EPS in the 11% to 13%. So

we will continue to be able to drive good leverage of our sales line into our EPS and, obviously, continue to generate very strong cash flow."

- "Obviously, *a key part of our story over the last couple of years has been our ability to drive gross margin expansion. And I will tell you that we will continue to do this into the future.* And as you look at the drivers of what will allow us to do that, it's largely the same drivers we've had today. It's going to be mix upgrades, first, at the highest level, with business mix driving margin expansion with bioscience being our highest-margin business, also the fastest-growing business, as well as product upgrades within each of the businesses. So you are going to get mix at a different level. And between, really, those two areas, that will be the majority of what will drive margin expansion into the future to that 55% range I mentioned, and has been, frankly, what has driven it up to this point, more so than I think most people understand."

56.     On January 28, 2010, the Individual Defendants caused Baxter to issue a press release reporting the Company's financial results for the full year and fourth quarter of 2009. The Company reported BioScience revenue of $1.5 billion for the quarter. The release further provided:

**First Quarter and Full-Year 2010 Outlook**

Baxter also announced today its guidance for the full year and first quarter of 2010. *For full-year 2010, Baxter expects sales, excluding the impact of foreign exchange, to grow 5 to 7 percent.* Including the benefit of foreign exchange, Baxter expects reported sales growth to increase 7 to 9 percent compared to 2009, based on current exchange rates. *The company also expects earnings per diluted share of $4.20 to $4.28, before any special items*, and expects to generate cash flow from operations of approximately $2.9 billion.

For the first quarter of 2010, Baxter expects sales growth, excluding the impact of foreign exchange, of approximately 5 to 7 percent. Including the benefit of foreign exchange, the company expects reported sales growth of approximately 10 to 12 percent compared to the first quarter of 2009, based on current exchange rates. The company also expects earnings per diluted share of $0.92 to $0.94, before any special items.

"Our 2010 guidance reflects balance across the businesses, continued global expansion, and our ability to deliver sustainable growth," said Robert M. Davis, corporate vice president and chief financial officer. "It is aligned with our long-range strategic and financial objectives, as we remain focused on delivering growth while making appropriate investments for the future."

57.     After releasing the fourth quarter 2009 results on January 28, 2010, the Individual Defendants caused Baxter to host a conference call for analysts, media representatives, and

-15-

investors. During the call Defendants Parkinson and Davis stated in part:

- "For the full year antibody therapy sales totaled $1.4 billion and increased 14% on a constant currency basis driven by higher global demand and year-on-year price increases. I'd mention that *we remain confident in the underlying fundamentals of this business and have not changed our outlook of mid- to high-single-digit growth in demand over our LRP*."

- "First, for the full year 2010, as you saw in the press release, we expect earnings per diluted share of $4.20 to $4.28. It's important to note that this guidance does not reflect any impact of potential US healthcare legislation reform. As you know, this is an evolving situation. We will continue to monitor the legislative process and we will provide an update to our guidance if and when it's appropriate to do so."

- "By line item of the P&L, we expect full-year sales growth, excluding the impact of foreign currency, of 5% to 7%."

- "*Finally, for the BioScience business we expect sales growth, excluding foreign currency, to be in the 6% to 8% range*. First, we expect recombinant sales growth in the 6% to 8% range. *Second, we expect plasma protein sales to grow in mid- to high-single-digits, and antibody therapy sales to grow in the mid-single-digit range*. Third, we expect the regenerative medicine business to again grow in mid teens."

- "For the first quarter, as we mentioned in our press release, we expect earnings per diluted share of $0.92 to $0.94 and sales growth, excluding the impact of foreign currency, of 5% to 7%."

- "Clearly 2009 was a very successful year financially, operationally and strategically. While we're certainly not without challenges, *we believe our company is very well positioned for 2010 and beyond*. While no company, including Baxter, is completely immune to the macroenvironment, *given the medically necessary nature of our products, our diversified healthcare model and strong market positions we're confident in our ability to drive improved performance*."

- "*Our 2010 outlook is aligned with our long-range strategic plans* and the solid underlying fundamentals we see in the markets in which we operate. And we remain committed to driving growth while investing in innovation and business development activities that position us for enhanced growth in the future."

- "*[I]t's only been what, four months since our investor conference, but there's nothing that's changed since then that would suggest we would deviate from our long-term outlook, long-term aspirations*. Obviously the guidance we

provide of EPS growth in 2010 is right in line with the 11% to 13% compounded EPS growth that we projected over the LRP."

- "So in the context of EPS growth, *2010 is just another year* that I think supports and builds that long-term outlook."

- "So we're hopeful that we'll be in a position to maybe do a few things this year as well that will support that top line. But, *the EPS growth that we're guiding for 2010 is right in line with the messaging for the long-range plan we communicated in September*."

## VI. THE TRUTH IS REVEALED

58. On April 22, 2010, the Individual Defendants caused Baxter to issue a press release reporting the Company's financial results for the first quarter of 2010 and providing updated guidance for the second quarter and full year 2010. The release provided:

**Second Quarter and Full-Year 2010 Outlook**

Baxter also announced today its guidance for the second quarter of 2010 and lowered its guidance for the full year.

*Previously, Baxter expected full-year 2010 sales growth, excluding the impact of foreign exchange, of 5 to 7 percent* (or 7 to 9 percent including foreign exchange); *full-year earnings per diluted share of $4.20 to $4.28, before any special items*; and cash flow from operations of approximately $2.9 billion.

*For full-year 2010, Baxter's revised outlook includes sales growth, excluding the impact of foreign exchange, of 1 to 3 percent* (or 3 to 5 percent including the benefit of foreign exchange) *and earnings, before any special items, of $3.92 to $4.00 per diluted share*. This outlook now includes the full-year impact of U.S. healthcare reform legislation enacted in the first quarter. In addition, Baxter now expects to generate cash flows from operations of approximately $2.7 billion.

*"Our revised financial guidance primarily reflects the impact of recent healthcare reform legislation in the U.S. and our outlook for continued plasma market pressures,"* explained Robert M. Davis, chief financial officer. "Despite these factors, we will continue to pursue opportunities to enhance growth through the development of new products and business development initiatives, while maintaining an intense focus on managing costs throughout the company."

For the second quarter of 2010, the company expects sales growth, excluding the impact of foreign exchange, of 0 to 2 percent (or 3 to 5 percent including the benefit of foreign exchange), and earnings, before any special items, of $0.90 to $0.93 per diluted share.

-17-

59.    Based on this revised outlook, Baxter's stock collapsed $7.82 per share to close at

$51.13 per share on April 22, 2010, a one-day decline of over 13%.

60.    On May 3, 2010, the Individual Defendants caused Baxter to issue a press release

announcing it was recalling the COLLEAGUE pumps in the United States. The release provided

in part:

> Baxter Healthcare Corporation today announced that it will recall COLLEAGUE
> infusion pumps from the U.S. market pursuant to an order under its existing June
> 2006 consent decree with the U.S. Food and Drug Administration (FDA). Baxter
> will work with the FDA to ensure that the recall process provides customers
> appropriate alternatives for supporting patients' needs.
>
> As previously disclosed, Baxter entered into a consent decree with FDA
> under which the company has been pursuing remediation of the infusion pumps.
> The decree permits FDA to require the recall of the pumps, and FDA has
> communicated to the company that it will require such a recall, with the company
> providing monetary consideration or replacement pumps to customers on a
> timeline to be determined with FDA and based on medical need. Baxter intends
> to work with FDA to minimize disruption to healthcare facilities using
> COLLEAGUE pumps. Baxter anticipates that, among alternatives to be provided
> to customers, the company will offer to exchange Baxter's Sigma SPECTRUM
> infusion pumps for COLLEAGUE infusion pumps without charge to customers.
>
> The consent decree permits Baxter to propose alternative actions to
> achieve the FDA's objectives under the decree, which the company intends to do.
> The final nature of the recall and offer to customers remain subject to that
> ongoing dialogue. Once final, Baxter will notify customers and make information
> available on www.baxter.com.
>
> Notwithstanding that uncertainty, the company currently anticipates that it
> will record a pre-tax special charge of $400 to $600 million in the first quarter for
> the reasonably estimable cost of the recall. The company is not otherwise
> revising its earnings guidance for the year in connection with the recall.

61.    Following Baxter's announcement, on May 3, 2010, the FDA issued its own

statement concerning Baxter's recall of the COLLEAGUE pumps, which stated in part:

> *The U.S. Food and Drug Administration sent a letter to Baxter
> Healthcare Corp. on April 30 ordering the company to recall and destroy all of
> its Colleague Volumetric Infusion Pumps (Colleague pumps) currently in use
> in the United States. This action is based on a longstanding failure to correct*

*many serious problems with the pumps.* The FDA believes there may be as many as 200,000 of those pumps currently in use.

*Additionally, the FDA is ordering the company to provide refunds to customers or replace pumps at no cost to customers [to] help defray the cost of replacement.*

Infusion pumps are devices that deliver fluids, including nutrients and medications, into a patient's body in a controlled manner. They are widely used in hospitals, other clinical settings and, increasingly, in the home because they allow a greater level of accuracy in fluid delivery.

Hospitals and other users of Baxter's Colleague pumps will be receiving further instruction and information from Baxter and the FDA regarding their transition.

The FDA has been working with Baxter since 1999 to correct numerous device flaws. Since then, Colleague pumps have been the subject of several Class I recalls for battery swelling, inadvertent power off, service data errors, and other issues.

*In June 2006, the FDA was [sic] obtained a consent decree of permanent injunction in which Baxter agreed to stop manufacturing and distributing all models of the Colleague pump until the company corrected manufacturing deficiencies and until devices in use were brought into compliance. Since then, Baxter has made numerous changes to the Colleague pumps but these changes have not corrected the product defect leading to the permanent injunction.*

On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012. The proposal also stated that Baxter does not anticipate completion of the proposed corrections until 2013. On that schedule, a device with known safety concerns would remain in use on patients needing specialized care until 2013. FDA found this proposal unacceptable. The 2006 consent decree gave FDA authority to take any action it deemed appropriate. *The FDA has determined that this action is necessary, as Baxter has failed to adequately correct, within a reasonable timeframe, the deficiencies in the Colleague infusion pumps still in use.*

Therefore the FDA is now ordering Baxter to:

Recall and destroy all Colleague infusion pumps.

Reimburse customers for the value of the recalled device[.]

Assist in finding a replacement for these customers.

Infusion pumps, including the Baxter Colleague models, have been the source of persistent safety problems. In the past five years, the FDA has received more than 56,000 reports of adverse events associated with the use of infusion pumps. Those events have included serious injuries and more than 500 deaths. Between 2005 and 2009, 87 infusion pump recalls were conducted to address identified safety concerns, according to FDA data.

An FDA analysis of these adverse events has uncovered software defects, user interface problems and mechanical and electrical failures. Problems with infusion pumps are not confined to one manufacturer or one type of device.

In response, last month the FDA announced a new initiative to address safety problems associated with infusion pumps. As part of its initiative, the FDA is moving to establish additional premarket requirements manufacturers will be expected to meet, in part through static testing in FDA's facilities before device submissions. The FDA is also holding a May public workshop on infusion pump design, and the agency is raising public awareness of the issue among health care workers and patients.

62.     Based on the recall of the COLLEAGUE pumps, Baxter's stock dropped $2.42 per share to close at $45.08 per share on May 4, 2010, a one-day decline of over 5%.

## VII.   REASONS THE STATEMENTS WERE FALSE AND MISLEADING

63.     The true facts, which were known the Individual Defendants but concealed from Baxter shareholders, were as follows:

(a)     Supplies of plasma were increasing and prices were decreasing because of the failed merger of Baxter's two largest competitors;

(b)     Baxter's boost in market share and gross profit margin while a competitor's merger was pending was only temporary and the Company was incapable of sustaining the benefits once the merger failed;

(c)     Baxter's revenue guidance for 2010 related to its plasma-derivative products business was overstated;

(d)     Baxter represented that its long-range plan for its BioScience division was revenue growth in the 7% to 9% range; the Company, however, was experiencing a loss in market share and pricing pressures related to its plasma-derivative products business;

(e)     Baxter was not complying with the June 2006 consent decree it had

entered into with the FDA regarding its COLLEAGUE pumps; and

      (f)    Baxter would not be able to complete remediation of the COLLEAGUE pumps in 2010.

## VIII.  NO SAFE HARBOR

64.    The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Forward-looking statements, if any, were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, the Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the specific forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Baxter who knew that those statements were false when made.

## IX.    THE STOCK REPURCHASE

65.    In July 2009, the Baxter Board authorized the Company to repurchase up to $2.0 billion of its common stock on the open market. The Board failed to act in the face of a known duty to act when they allowed the Company's senior officers to purchase a total of over *$1.4 billion* of its own stock.

66.    The purchases of the Company's stock, however, were at artificially inflated prices as a result of the false and misleading statements, press releases, and filings with the SEC that misrepresented (1) the Company's growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company's non-compliance with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and the Company's inability to complete the remediation of the COLLEAGUE pumps in 2010.

67.     Additionally, the Baxter Board was well aware of the false and misleading statements during the entire repurchase period from September 1, 2009 through June 30, 2010. Nonetheless, the Board did not halt the Company's purchases and continued to allow the Company to purchase shares at artificially inflated prices. The Board's decision was not the product of a valid business judgment.

68.     The following were the average prices paid for the Company's common stock during the buyback:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| 7/1/09 – 7/31/09 | 938,921 | $53.25 | $49,997,543 |
| 8/1/09 – 8/31/09 | 245,000 | $56.92 | $13,945,400 |
| 9/1/09 – 9/30/09 | 638,950 | $56.42 | $36,049,559 |
| 10/1/09 – 10/31/09 | 1,059,905 | $55.20 | $58,506,756 |
| 11/1/09 – 11/30/09 | 1,211,408 | $54.80 | $66,385,158 |
| 12/1/09 – 12/31/09 | 2,205,100 | $56.69 | $125,007,119 |
| 1/1/10 – 1/31/10 | 753,565 | $59.44 | $44,791,903 |
| 2/1/10 – 2/28/10 | 3,470,345 | $56.93 | $197,566,740 |
| 3/1/10 – 3/31/10 | 3,293,217 | $58.49 | $192,620,262 |
| 4/1/10 – 4/30/10 | 2,606,000 | $49.09 | $127,928,540 |
| 5/1/10 – 5/31/10 | 7,791,400 | $44.84 | $349,366,376 |
| 6/1/10 – 6/30/10 | 4,765,200 | $41.81 | $199,233,012 |
|  |  |  |  |
| **TOTAL** | **28,040,090** |  | **$1,461,398,368** |

69.     Under the Board's authorization, the Company bought back more than *$1.4 billion* worth of its shares at a weighted average price of $52.11. Tellingly, this weighted average price is substantially higher than Baxter's share price when its true business health was revealed, dropping Baxter's stock price to $40.67 per share on May 21, 2010. This drop removed the inflation from Baxter's stock price, causing real economic loss to the Company which, at the Board's direction, had purchased stock during this time period.

70.     Baxter's Board caused Baxter to waste more than a billion dollars on stock purchases. Because the price of Baxter's shares was artificially inflated by way of the Individual Defendants' concealment and misrepresentations, the Company, unbeknownst to its shareholders, materially overpaid for its own stock. The stock purchases falsely signaled to

Baxter's shareholders and the public that the purchase of the Company's stock at those prices was the best use of Baxter's cash. In reality, however, Baxter's stock price was inflated because the Individual Defendants misrepresented (1) the Company's growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company's non-compliance with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and the Company's inability to complete the remediation of the COLLEAGUE pumps in 2010.

71.     Besides constituting corporate waste and a violation of fiduciary duties by the Board, the Company's share purchases also violated the federal securities laws because the Individual Defendants caused Baxter to purchase its own shares at prices that were artificially inflated by the Individual Defendants' material misrepresentations and omissions, thereby damaging Baxter.

## X.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

72.     By reason of their positions as officers, directors, and/or fiduciaries of Baxter and because of their ability to control the business and corporate affairs of Baxter, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Baxter in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Baxter and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

73.     Each director and officer of the Company owes to Baxter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so

that the market price of the Company's stock would be based on truthful and accurate information.

### B. Audit Committee Duties

74. In addition to these duties, the Audit Committee Defendants owed specific duties, under the Audit Committee's Charter in effect during 2009 and 2010, to Baxter to review and approve quarterly and annual financial statements, earnings press releases, and the Company's internal controls over financial reporting. The Audit Committee met 11 times in 2009. Some of the Audit Committee's responsibilities included:

(a) reviewing the adequacy and effectiveness of Baxter's internal controls over financial reporting with management and the independent registered public accounting firm and internal auditors, and reviewing with management Baxter's disclosure controls and procedures;

(b) reviewing the Company's consolidated financial statements including Management's Discussion and Analysis of Financial Condition and Results of Operations and discussing with the independent registered public accounting firm the quality and acceptability of accounting principles used to prepare the consolidated financial statements;

(c) reviewing and discussing earnings and press releases prior to issuance of the releases (conducted by the Audit Committee Chairman);

(d) holding separate executive sessions with the internal auditor, the independent registered public accounting firm and management; and

(e) discussing guidelines and policies governing the process by which Baxter assesses and manages risk.

### C. Control, Access, and Authority

75. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Baxter, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Baxter.

-24-

76.     Because of their advisory, executive, managerial, and directorial positions with Baxter, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Baxter, including information regarding the future growth rate of Baxter's plasma-derivative products business and the FDA's recall of the COLLEAGUE pumps.

77.     At all times relevant, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Baxter, and was at all times acting within the course and scope of such agency

**D.      Reasonable and Prudent Supervision**

78.     To discharge their duties, the officers and directors of Baxter were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Baxter were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how Baxter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices

and make such disclosures as necessary to comply with securities laws; and

        (f)     ensure that Baxter was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## XI.    BREACHES OF DUTIES

79.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Baxter, the absence of good faith on their part, and a reckless disregard for their duties to Baxter and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Baxter. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Baxter's Board.

80.    The Individual Defendants each breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and or failing to disclose: (1) the Company overstated its growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company was not complying with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and that the Company would be unable to complete the remediation of the COLLEAGUE pumps in 2010. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, Baxter has expended, and will continue to expend, significant sums of money.

## XII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their liability. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.    During all relevant times, the Individual Defendants collectively and individually

initiated a course of conduct that was designed to and did conceal that: (1) the Company overstated its growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company was not complying with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and that the Company would be unable to complete the remediation of the COLLEAGUE pumps in 2010. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

83. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue false and misleading statements regarding Baxter's revenue and earnings outlook for 2010.

84. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (ii) disguise the Company's future business prospects.

85. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XIII. DAMAGES TO BAXTER

87.     The Individual Defendants' wrongful conduct was the direct and proximate cause of damages Baxter suffered in numerous ways. As discussed above, Baxter bought back more than *$1.4 billion* worth of its shares at a price that was substantially higher than Baxter's share price when its true business health was revealed.

88.     In addition, as a result of the Individual Defendants' wrongful conduct, Baxter disseminated overstated financial statements. The Company's growth prospects for its plasma-derivative products business were inflated and the failed merger of Baxter's competitors ensured that Baxter's gross margins would not improve. Because of the Individual Defendants' wrongful conduct, Baxter failed to disclose that it was not complying with the terms of a June 2006 consent decree entered into with the FDA. The improper statements and material omissions have devastated Baxter's credibility. Baxter is now the subject of a class action lawsuit, alleging violations of securities laws in connection with the improper financial reporting, false statements, and material omissions. The Company will face substantial costs in connection with that lawsuit.

89.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Baxter's market capitalization has been substantially damaged.

90.     Further, as a direct and proximate result of the Individual Defendants' conduct, Baxter has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

    (a)     costs incurred in investigating and defending Baxter and certain officers in the class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

    (b)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Baxter's artificially-inflated stock price and inflated growth prospects; and

    (c)     costs incurred from the loss of the Company's customers' confidence in Baxter's products, particularly the COLLEAGUE pumps.

91. Moreover, these actions have irreparably damaged Baxter's corporate image and goodwill. For at least the foreseeable future, Baxter will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Baxter's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XIV. INSIDER SELLING ALLEGATIONS

92. Defendants Parkinson, Davis, and Riedel made good use of their inside knowledge about Baxter's plasma-derivative products business and the Company's false and misleading statements about its growth prospects. Defendants Parkinson, Davis, and Riedel also made good use of their inside knowledge that the Company had failed to correct the deficiencies with the COLLEAGUE infusion pump and was not in compliance with the June 2006 consent decree with the FDA. The following chart identifies the insider sales of Baxter stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds | % Sold |
|---|---|---|---|---|---|
| PARKINSON | 1/20/2010 | 88,400 | $60.80 | $5,374,720 | |
| Total: | | 88,400 | | $5,374,720 | 22% |
| | | | | | |
| DAVIS | 1/20/2010 | 16,418 | $60.80 | $998,214.40 | |
| | 3/15/2010 | 842 | $58.37 | $49,652.74 | |
| Total: | | 17,260 | | $1,047,867.10 | 28% |
| | | | | | |
| RIEDEL | 12/02/2009 | 92,500 | $55.92 | $5,172,600 | |
| | 1/20/2010 | 6,323 | $60.80 | $384,438.40 | |
| | 3/05/2010 | 75,600 | $59.29 | $4,482,324 | |
| | 3/15/2010 | 763 | $58.37 | $44,536.31 | |
| Total: | | 175,186 | | $10,083,899 | 78% |
| | | | | | |

## XV.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.     Plaintiff brings this action derivatively in the right and for the benefit of Baxter to redress injuries suffered, and to be suffered, by Baxter as a direct result of breaches of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and insider trading, as well as the aiding and abetting thereof, by the Individual Defendants.  Baxter is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.     Plaintiff will adequately and fairly represent the interests of Baxter in enforcing and prosecuting its rights.

95.     Plaintiff was a shareholder of Baxter at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

96.     The Board of Baxter currently consists of the following thirteen Defendants: Boomer, Devitt, Forsyth, Fosler, Gavin, Hellman, Hockmeyer, Martin, Parkinson, Shapazian, Stallkamp, Storm, and Stroucker.

### A.     Demand Is Futile As To Defendant Parkinson

97.     Defendant Parkinson faces a substantial likelihood of liability for his individual misconduct.  Parkinson is a named defendant in one or more federal class actions pending in the Northern District of Illinois alleging that he and the Company Defendants violated §10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved false statements.

98.     If Defendant Parkinson pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.  This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Parkinson's personal liability in the class action.  As such, Defendant Parkinson is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile as to Defendant Parkinson.

99.     Additionally, Defendant Parkinson cannot render an independent decision because he is and was a high-ranking officer of Baxter during the time period when the

wrongdoing occurred. Defendant Parkinson is Chairman of the Board and Chief Executive Officer of the Company. According to relevant portions of the Company's 2010 proxy statement, Defendant Parkinson is not an independent director. Thus, Defendant Parkinson is a current Company insider and therefore cannot independently consider a demand.

100. Additionally, Defendant Parkinson is interested because he issued many of the false and misleading statements. Defendant Parkinson therefore faces a substantial likelihood of liability for breaching his fiduciary duties to Baxter shareholders. Consequently, Defendant Parkinson cannot disinterestedly consider a demand.

101. Further, Defendant Parkinson engaged in insider trading in violation of Illinois and Delaware law. Parkinson sold 88,400 shares of Baxter stock for proceeds of $5,374,720 while in possession of material non-public information. Defendant Parkinson, because of his high-level position as Chairman of the Board and Chief Executive Officer of the Company, knew that Baxter issued false and misleading statements about the Company's growth prospects related to its plasma-derivative products business. Parkinson also knew that the Company had failed to correct the deficiencies with the COLLEAGUE infusion pumps and that the Company was not in compliance with the June 2006 consent decree with the FDA. Defendant Parkinson took advantage of this undisclosed information to sell his stock for considerably more than the stock was worth. Because Defendant Parkinson faces a substantial likelihood of liability for engaging in insider trading, he is unable to render a disinterested decision on whether to pursue these derivative claims. As such, demand is futile as to Defendant Parkinson.

**B.     Demand Futility as to the Audit Committee Defendants**

102. Defendants Devitt, Fosler, Stallkamp, Storm, and Stroucken, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and Baxter's internal controls over financial reporting. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false financial statements that did not properly account for (i) the Company's plasma-derivative products business and its growth prospects; and (ii) Baxter's non-compliance with the

terms of a June 2006 consent decree it had entered into with the FDA. The Audit Committee Defendants also reviewed and approved Baxter's financial reporting internal controls, which were ineffective.

103. Accordingly, Defendants Devitt, Fosler, Stallkamp, Storm, and Stroucken face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon these Defendants is futile.

### C. Demand Is Futile As To All Of The Director Defendants For Additional Reasons

104. Baxter's main business is its BioScience segment, which brought in $5.6 billion in revenue in 2009 and accounts for 45% of the Company's revenue. A major part of Baxter's BioScience business involves refining donated plasma to make products that treat problems such as immune-system disorders and hemophilia. Thus, a critical component of Baxter's revenues is generated from its plasma-derivative products. Baxter's growth prospects for its plasma-derivative products business was a forceful indicator of the Company's business condition and the metric that the market used to measure the Company's current and future financial performance. Indeed, when the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire board through inference as a matter of law. Thus, each of the members of Baxter's Board are charged with having knowledge of the issues described herein related to the Company's false and misleading statements about its growth prospects and revenue and earnings outlook for 2010.

105. Baxter's second largest segment is its Medication Delivery segment, which brought in $4.65 billion in revenue in 2009 and accounts for 37% of the Company's revenue. A major part of the Medication Delivery business is the manufacture and sale of electronic infusion pumps that deliver intravenous fluids. Baxter's COLLEAGUE pump was introduced in the 1990s but came under intense FDA scrutiny in 1999. In 2005, authorities seized more than 6,000 COLLEAGUE pumps that had serious defects. Consequently, the FDA forced Baxter to stop selling COLLEAGUE pumps. But since 200,000 pumps remained on the market for use in

hospitals and healthcare facilities, Baxter agreed to work with the FDA on a remediation plan to correct the deficiencies of the COLLEAGUE pumps still in operation. Baxter failed to do so. A serious product defect that was scrutinized and highly publicized by the FDA could not escape the notice of Baxter's Board. Thus, each of the members of Baxter's Board are charged with having knowledge of the issues related to Baxter's COLLEAGUE pumps and Baxter's failure to comply with the FDA.

106. The Director Defendants, as members of Baxter's Board, each knew, failed to act in the face of a known duty to act, and/or were grossly negligent when they allowed the Company to issue public statements, press releases, and filings with the SEC regarding the Company's growth prospects and revenue and financial outlook for 2010. Moreover, the Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence allowed this materially false and misleading information to be disseminated to the investing public. The Director Defendants knowingly, with conscious disregard, and/or gross negligence participated in the dissemination of this deceptive information. Thus, the Director Defendants are each subject to a substantial likelihood of liability. Thus, demand is futile as to the Director Defendants.

107. The Director Defendants, as members of Baxter's Board, each had a duty to ensure that reliable systems of financial controls and reporting were in place at the Company and functioning properly. Baxter, however, did not accurately report its future growth prospects or revenue and financial outlook for 2010. Baxter also omitted material information about its compliance with the FDA concerning its COLLEAGUE pumps. The Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence ignored the fact that the Company lacked adequate internal controls. Despite this, the Director Defendants took no steps to avert or correct the situation. The Company's lack of adequate internal controls allowed the materially false and misleading information regarding the Company's financial reporting to be disseminated to the investing public. Thus, the Director Defendants are each subject to a substantial likelihood of liability. Thus, demand is futile as to the Director

Defendants.

108.     Further, the Director Defendants authorized the Company to repurchase $2 billion of its common stock on the open market. The Company's senior officers caused Baxter to purchase over $1.4 billion of its own stock between September 1, 2009 and June 30, 2010. The purchases of the Company's stock, however, were at artificially inflated prices as a result of the false and misleading public statements, press releases, and filings with the SEC. Each of these Defendants knew, failed to act in the face of a known duty to act, and/or with gross negligence should have know that the Individual Defendants' statements were false and misleading, and that, as a result, the Company's stock was artificially inflated. Nonetheless, the Director Defendants authorized the Company's repurchase program and failed to halt Baxter's share purchases. Thus, the Director Defendants are each subject to a substantial likelihood of liability. Thus, demand is futile as to the Director Defendants.

109.     If Baxter's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Baxter against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Baxter, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O insurance policy.

110.     Under the factual circumstances described herein, the Individual Defendants are

more interested in protecting themselves than they are in protecting Baxter by prosecuting this action. Therefore, demand on Baxter and its Board is futile and is excused.

111.     Baxter has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against Defendants Parkinson and Davis For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

112.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.     The wrongful conduct alleged regarding the issuance of false and misleading statements, from about September 2009 through May 2010, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

114.     As alleged above, from September 2009 to May 2010, Defendants Parkinson and Davis knowingly, or with deliberate recklessness, made and caused the publication of false and misleading statements regarding (1) the Company's growth prospects for its plasma-derivative products business and the Company's earnings outlook for 2010; and (2) the Company's non-compliance with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps and the Company's inability to complete the remediation of the COLLEAGUE pumps in 2010.

115.     Baxter purchased 28,040,090 shares of its own stock on the open market, for a total cost to Baxter of $1,461,398,368, when Defendants Parkinson and Davis knew that Baxter's stock price was artificially inflated due to their misleading statements.

116.     The false statements and repurchases of Baxter stock were intended to and did

manipulate and/or deceive Baxter and its shareholders and served to further artificially inflate the Company's stock price.

117.    Defendants Parkinson and Davis thereby violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud Baxter;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Baxter in connection with the purchases of Baxter common stock.

118.    As a direct and proximate result of the wrongful conduct of Defendants Parkinson and Davis, Baxter has and will suffer damages in connection with its purchases of Baxter common stock at prices that Defendants Parkinson and Davis knew to be artificially inflated.

119.    But for the misconduct of Defendants Parkinson and Davis, Baxter would not have purchased its stock at artificially inflated prices. Baxter reasonably relied on the diligence, loyalty, and good faith of Defendants Parkinson and Davis in purchasing its stock.

120.    Defendants Parkinson and Davis are therefore liable to Baxter for damages in an amount to be determined at trial pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Director Defendants for Violation of §20(a) of the Exchange Act

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

122.    The wrongful conduct alleged regarding the issuance of false and misleading statements, from about September 2009 through May 2010, was continuous, connected, and was on-going throughout the applicable time period. It likewise resulted in continuous, connected, and on-going harm to the Company.

123. The Director Defendants had the power, and/or ability to, and did, directly, or indirectly control or influence the Company's general affairs, and had the power and/or ability directly or indirectly to control or influence Defendants Parkinson and Davis, in connection with the specific conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

124. The Director Defendants did not act in good faith in regard to these allegations. They are jointly and severally liable under §20(a) of the Exchange Act to the same extent as Defendants Parkinson and Davis for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.

## COUNT III

### Against Defendants Parkinson and Davis For Breach of Fiduciary Duty Related To The Dissemination of False and Misleading Financial Statements

125. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126. Defendants Parkinson and Davis owed and owe Baxter fiduciary obligations. By reason of their fiduciary relationships, these Defendants owed and owe Baxter the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

127. Defendants Parkinson and Davis violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

128. Defendants Parkinson and Davis each knowingly, recklessly or negligently signed and falsely certified false annual and quarterly financial statements that misrepresented and failed to disclose material information concerning the Company's growth prospects, and revenue and financial outlook for 2010. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129. As a direct and proximate result of these Defendants' failure to perform their fiduciary obligations, Baxter has sustained significant damages. As a result of the misconduct

alleged herein, these Defendants are liable to the Company.

130.     Plaintiff, on behalf of Baxter, has no adequate remedy at law.

## COUNT IV

### Against Audit Committee Defendants Devitt, Fosler, Stallkamp, Storm, and Stroucken For Breach of Fiduciary Duty

131.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.     The Audit Committee Defendants – Devitt, Fosler, Stallkamp, Storm, and Stroucken – owed and owe Baxter fiduciary obligations. Additionally, as members of the Audit Committee, these Defendants owed and owe specific duties under the Audit Committee charters to review and discuss the Company's quarterly and annual financial results and earnings releases, and to review the effectiveness and adequacy of the Company's internal control structure. By reason of their fiduciary relationships, these Defendants owed and owe Baxter the highest obligation of loyalty and good faith.

133.     The Audit Committee Defendants each violated and breached their fiduciary duties of loyalty and good faith, reasonable inquiry, oversight and supervision by knowingly or recklessly: (i) reviewing and approving false financial statements; and (ii) reviewing and approving ineffective internal controls over financial reporting.

134.     The Audit Committee Defendants' actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interest.

135.     As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, Baxter has sustained significant damages. As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

## COUNT V

### Against The Individual Defendants for Breach of Fiduciary Duty

136.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    The Individual Defendants' misconduct alleged herein constituted a breach of their fiduciary duties to Baxter for abuse of control and gross mismanagement, for which they are legally responsible.

138.    As a direct and proximate result of the Individual Defendants' breaches, Baxter has sustained significant damages.

139.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of Baxter, has no adequate remedy at law.

### COUNT VI

**Against Defendants Parkinson, Davis, and Riedel for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    At the time Defendants Parkinson, Davis, and Riedel sold their Baxter stock, they knew the information described above, and sold Baxter stock on the basis of such information.

143.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants Parkinson, Davis, and Riedel used for their own benefit when they sold Baxter stock.

144.    At the time of their stock sales, Defendants Parkinson, Davis, and Riedel knew that the Company's revenues were materially overstated.  Defendants Parkinson, Davis, and Riedel's sales of Baxter stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

145.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Parkinson, Davis, and Riedel's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

146.    Plaintiff, on behalf of Baxter, has no adequate remedy at law.

## COUNT VII

### Against Defendants Parkinson and Davis for Unjust Enrichment

147. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148. By their wrongful acts and omissions, Defendants Parkinson and Davis were unjustly enriched at the expense of and to the detriment of Baxter.

149. Defendants Parkinson and Davis were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Baxter.

150. Plaintiff, as a shareholder and representative of Baxter, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

151. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

## COUNT VIII

### Against Director Defendants for Breach of Fiduciary Duty for Authorizing and Failing to Halt the Company's Stock Purchases

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. The wrongful conduct alleged regarding the issuance of false and misleading statements, from about September 2009 to May 2010, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

154. The Director Defendants owed and owe Baxter fiduciary obligations. By reason of their fiduciary relationships, these Defendants owed and owe Baxter the highest obligation of loyalty, fair dealing, and good faith.

155. The Director Defendants violated and breached their fiduciary duty by knowingly, or with conscious disregard of their duties, authorizing Baxter's stock repurchase plan and failing to halt the Company's purchases under the stock repurchase plan while Baxter's share price was artificially inflated as a result of the false and misleading statements. Baxter repurchased

28,040,090 shares of its own stock on the open market, for a total cost to Baxter of $1,461,398,368.

156. The Director Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157. As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Baxter has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**COUNT IX**

**Against All Defendants for Waste of Corporate Assets**

158. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159. The wrongful conduct alleged regarding the issuance of false and misleading statements, from about September 2009 through May 2010, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

160. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing Baxter to purchase over $1.4 billion of its own stock at artificially inflated prices; (ii) paying bonus and non-equity incentive compensation to certain executive officers; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

161. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

162. Plaintiff, on behalf of Baxter, has no adequate remedy at law.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches

-41-

of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.    Directing Baxter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Baxter and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Baxter to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Baxter's directors, executives, and other employees;

- a proposal prohibiting insiders from trading Baxter securities based upon material non-public information;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.    Awarding to Baxter restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## XVII.  JURY DEMAND

Plaintiff demands a trial by jury.

-42-

DATED: October 29, 2010

PATRICIA SALYERS, derivatively on behalf of
BAXTER INTERNATIONAL, INC.,

_____
One of Plaintiff's attorneys.

Jeffrey A. Leon
FREED & WEISS LLC
111 West Washington, Suite 1331
Chicago, IL 60602
Telephone: (312) 220-0000
Facsimile: (312) 220-7777

Frank J. Johnson
Francis A. Bottini, Jr.
Keith M. Cochran
JOHNSON BOTTINI, LLP
501 West Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

Counsel for Plaintiff

## VERIFICATION

I, Patricia Salyers, hereby verify that I am a shareholder of Baxter International, Inc., (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Verified Shareholder Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: _10/26/10_                   _____
                                          Patricia Salyers